1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KESSLER TOPAZ**
      **MELTZER & CHECK, LLP**
Eric L. Zagar (Bar No. 250519)
James H. Miller
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: 610.667.7706
Facsimile: 610.667.7056
E-mail: ezagar@ktmc.com
E-mail: jmiller@ktmc.com

*Attorneys for Plaintiff Carmen Di Giovanni*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

CARMEN DI GIOVANNI, Derivatively
on Behalf of Nominal Defendant
BRIDGEPOINT EDUCATION, INC.,

            Plaintiff,

      v.

ANDREW S. CLARK, RYAN CRAIG,
DALE CRANDALL, MARYE ANNE
FOX, PATRICK T. HACKETT, ROBERT
HARTMAN, ADARSH SARMA,
WARBURG PINCUS & CO., WARBURG
PINCUS LLC, WARBURG PINCUS
PARTNERS LLC and WARBURG
PINCUS PRIVATE EQUITY VIII, L.P.,

            Defendants,

      and

BRIDGEPOINT EDUCATION, INC.,

            Nominal Defendant.

Case No. **'13CV2947** H      BLM

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Carmen Di Giovanni ("Plaintiff"), by and through the undersigned counsel, brings the following Verified Shareholder Derivative Complaint (the "Complaint") on behalf of nominal defendant Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") against the members of the board of directors of Bridgepoint (the "Board") and the Company's controlling stockholder, Warburg Pincus Private Equity VIII, L.P. ("WP VIII") and its affiliates (together, "Warburg"). The allegations of the Complaint are based on the knowledge of Plaintiff as to himself, and on information and belief, including the investigation of counsel and review of publicly available information, as to all other matters.

## SUMMARY OF THE ACTION

1.      Plaintiff brings this action derivatively for the benefit of nominal defendant Bridgepoint against the Board and Warburg seeking to remedy defendants' breaches of fiduciary duties.

2.      In gross breach of their fiduciary duties as directors and the controlling stockholder of the Company, the Defendants (as defined herein) have wrongfully caused and allowed the Company to commence a self-tender offer (the "Tender Offer") to unduly benefit the Individual Defendants (as defined herein) and the Company's controlling stockholder, Warburg, at the expense of the Company.

3.      Specifically, the Defendants have caused the Company to commence the Tender Offer at $19.50 per share, a price higher than the closing price of the Company's common stock on all but seven (7) trading days since July 6, 2012, the day before the Company's stock began a precipitous decline after the public learned that Ashford University ("Ashford"), which is owned and operated by Bridgepoint, was denied accreditation.  Indeed, the $19.50 per share Tender Offer price is higher than the Company's average 10-day, 30-day, 60-day, 90-day, 6-month, 12-month and year-to-date closing stock prices up to and including November 12, 2013, the day before the Tender Offer was announced.

4.      The Tender Offer was approved and commenced by the Board with the intent of allowing Warburg to sell a substantial portion of its Bridgepoint common stock and allowing the

Company's directors and officers to sell all their personally held Bridgepoint common stock at a time of great turmoil for the Company.   Thus, the Tender Offer was conceived, proposed, negotiated, timed and initiated to benefit the Defendants, who stand on both sides of the Tender Offer.   However, the Board failed to ensure that the Tender Offer was entirely fair to the Company, as required pursuant to Delaware law.

5.     Plaintiff brings this Action to recover for the Company the damages caused by the Tender Offer and to compel the Defendants to disgorge to the Company any payments and/or benefits received in connection with the Tender Offer.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.   This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).   This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

7.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.   One or more of the Defendants either resides in or maintains executive offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

8.     Plaintiff Carmen Di Giovanni currently owns shares of Bridgepoint common stock, owned such shares at the time the events and transactions complained of herein transpired, and will continue to own Bridgepoint common stock throughout this litigation.   Plaintiff is a citizen of the Commonwealth of Pennsylvania.

9.      Nominal Defendant Bridgepoint is a Delaware corporation with its principal executive offices located at 13500 Evening Creek Drive North, Suite 600, San Diego, California 92128, and therefore is a citizen of the States of Delaware and California.

10.     Defendant Andrew S. Clark ("Clark") has served as Chief Executive Officer and a director of the Company since November 2003 and President since February 2009.   Upon information and belief, defendant Clark is a citizen of the State of California.

11.     Defendant Ryan Craig ("Craig") has served as a director of the Company since November 2003.  From 2001 to 2004 he was an associate at Warburg Pincus LLC ("WP LLC") in the education sector.  He is a member of the Audit, Nominating and Governance and Strategic Oversight Committees of the Board.  Upon information and belief, defendant Craig is a citizen of the State of California.

12.     Defendant Dale Crandall ("Crandall") has served as a director of the Company since December 2008.  He is Chair of the Audit and Strategic Oversight Committees of the Board and a member of the Compensation Committee of the Board.   Upon information and belief, defendant Crandall is a citizen of the State of California.

13.     Defendant Marye Anne Fox ("Fox") has served as a director of the Company since November 2011.  She is a member of the Nominating and Governance and Strategic Oversight Committees of the Board.  Upon information and belief, defendant Fox is a citizen of the State of California.

14.     Defendant Patrick T. Hackett ("Hackett") has served as a director of the Company since March 2008 and as Chairman of the Board since February 2009.  He is a managing director and co-head of the technology, media and telecommunications group at WP LLC, which he joined in 1990, and a general partner of Warburg Pincus & Co. ("WP").   He is Chair of the Compensation Committee of the Board.  Upon information and belief, defendant Hackett is a citizen of the State of Connecticut.

15.     Defendant Robert Hartman ("Hartman") has served as a director of the Company since November 2006.  He is a member of the Audit and Nominating and Governance Committees of the Board.  Upon information and belief, defendant Hartman is a citizen of the State of Arizona.

16.     Defendant Adarsh Sarma ("Sarma") has served as a director of the Company since July 2005.  He is a managing director in the technology, media and telecommunications group at WP LLC, which he joined as a principal in 2005.  He is Chair of the Nominating and Governance Committee of the Board and a member of the Compensation and Strategic Oversight Committees of the Board.  Upon information and belief, defendant Sarma is a citizen of the State of New York.

17.     Defendant WP is a corporation organized under the laws of the State of New York.  WP is the managing member of WP Partners.  WP maintains its corporate headquarters at 450 Lexington Avenue, New York, New York.  Upon information and belief, WP is a citizen of the State of New York.

18.     Defendant WP LLC is a limited liability corporation organized under the laws of the State of New York.  WP LLC maintains its corporate headquarters at 450 Lexington Avenue, New York, New York.  Upon information and belief, WP LLC is a citizen of the State of New York.

19.     Defendant Warburg Pincus Partners LLC ("WP Partners") is a limited liability corporation organized under the laws of the State of Delaware.  WP Partners is the sole general partner of WP VIII.  WP Partners is a direct subsidiary of WP.  WP Partners maintains its corporate headquarters at 450 Lexington Avenue, New York, New York.  Upon information and belief, WP Partners is a citizen of the States of Delaware and New York.

20.     Defendant WP VIII is a limited partnership organized under the laws of the State of Delaware.  WP VIII is the Warburg entity that directly owns the shares of Bridgeport common stock owned by the Warburg entities.  WP VIII is managed by WP LLC.  WP VIII maintains its corporate headquarters at 450 Lexington Avenue, New York, New York.  Upon information and belief, WP VIII is a citizen of the States of Delaware and New York.

21.     Together, defendants Clark, Craig, Crandall, Fox, Hackett, Hartman and Sarma may be referred to herein as the "Individual Defendants".  Together, defendants WP, WP LLC, WP Partners and WP VIII may be referred to herein as the "Warburg Defendants" or "Warburg".  Together, the Individual Defendants and the Warburg Defendants may be referred to herein as the "Defendants".

## FACTUAL ALLEGATIONS

### Overview of Bridgepoint

22.     According to its public filings, Bridgepoint is a provider of postsecondary education services.  It operates two institutions, Ashford and University of the Rockies (together, the "Institutions").   The Institutions deliver programs primarily online, as well as at their traditional campuses.   In total, 81,810 total students were enrolled at the Institutions as of December 31, 2012.

23.     Bridgepoint was founded in early 2004 by defendant Clark.  After knocking on doors of various financing sources, Clark solicited a $20 million investment from Warburg, which was used to recapitalize a company called Charter Learning, later renamed Bridgepoint.  The $20 million investment from Warburg is the only outside money that was ever put into Bridgepoint.

24.     In March 2005, the Company acquired The Franciscan University of the Prairies, located in Clinton, Iowa, and renamed it Ashford University.   Ashford offers associate's, bachelor's and master's degree programs online, as well as bachelor's degree programs at its campus in Clinton, Iowa.  Ashford is comprised of four colleges: the Forbes School of Business, the College of Education, the College of Health, Human Services and Science, and the College of Liberal Arts.   According to the Company, Ashford is helping to define the modern college experience by combining the heritage of a traditional campus with the flexibility and effectiveness of online learning.

25.     In September 2007, the Company acquired the Colorado School of Professional Psychology, located in Colorado Springs, Colorado, and renamed it University of the Rockies.  University of the Rockies is a graduate institution that offers master's and doctoral degree

programs in the social and behavioral sciences.  Classes at University of the Rockies are presented in a progressive online format, as well as at its campus in Colorado Springs, Colorado.  Similar to Ashford, most students at University of the Rockies attend via the institution's accessible online platform, which is also available through mobile applications.

26.     On December 22, 2008, the Company filed with the United States Securities and Exchange Commission (the "SEC") a Form S-1 Registration Statement in which the Company announced its plan to conduct an initial public offering ("IPO").  On April 16, 2009, the Company filed with the SEC a Prospectus on Form 424B4 (the "2009 Prospectus"), pursuant to which it conducted its IPO.  In total, 13,500,000 shares of Bridgepoint common stock were sold in the IPO, with Warburg selling 9,095,297 shares.  The gross IPO price was $10.50 per share, and the Company and Warburg realized $9.8175 per share after underwriting expenses were subtracted.  Thus, Warburg received $89,293,078 in proceeds as a result of the IPO, a 346% return on its initial investment.   Warburg also retained 34,589,220 shares of Bridgepoint common stock following the IPO, or approximately 65.1% of the Company's outstanding common stock.  Warburg continued to own these shares as of November 13, 2013, comprising 63.4% of the Company's outstanding common stock.

*Overview of Warburg*

27.     Warburg is a global private equity firm with offices in the United States, Europe, Brazil, China and India.  Warburg has been a private equity investor since 1966 and currently has approximately $35 billion in assets under management and investments in a wide range of sectors.

28.     Warburg focuses on growth investing, which is defined as follows:

> A strategy whereby an investor seeks out stocks with what they deem good growth potential. In most cases a growth stock is defined as a company whose earnings are expected to grow at an above-average rate compared to its industry or the overall market.

29.     Warburg, like most (if not all) private equity firms, raises capital in various "funds" and then deploys that capital into various investments, such as Bridgepoint.  Also, like most (if not all) private equity firms, Warburg must realize gains on its investment in order to (a) return profits

to the investors in its funds (otherwise it will not be able to raise additional funds), and (b) return profits to itself.  Private equity funds generally strive to limit the time horizon of their investments while maximizing their profits.

***General Financial Risks Facing the Company***

30.     The Company has realized significant growth in the past 6 years, increasing its enrollment from 12,623 as of December 31, 2007 to 81,810 as of December 31, 2012, an increase of 548%.  However, this growth has not been without risk to the Company.  Indeed, according to the Company's annual report on Form 10-K for the fiscal year ended December 31, 2012 (the "FY12 10-K"), the Company's growth "may place a strain on [its] resources":

> We have experienced significant growth over the last five years. Such historical growth, as well as any further growth that we may experience, may place a significant strain on our resources. Such growth has increased demands on our management information and reporting systems, data analytics, and financial management controls. If we are unable to maintain appropriate internal controls, we may experience operating inefficiencies that could increase our costs. Additionally, if we and our institutions fail to hire and retain appropriate levels of personnel in critical areas, we could experience increased student complaints, delays in completing critical business projects, system down-time for both internal and student-facing applications, and potential regulatory noncompliance, any of which could materially and adversely affect our business and prospects.

31.     Furthermore, the Company stated in the FY12 10-K that its "failure to obtain additional capital in the future could adversely affect [its] ability to grow":

> We believe that cash flow from operations will be adequate to fund our current operating plans for the foreseeable future. However, we may need additional financing in order to finance our plans, particularly if we pursue any acquisitions. The amount, timing and terms of such additional financing will vary principally depending on the timing and size of new program offerings, the timing and size of acquisitions we may seek to consummate and the amount of cash flows from our operations. To the extent that we require additional financing in the future, such financing may not be available on terms acceptable to us or at all and, consequently, we may not be able to fully implement our plans.

32.     The Company also warned in the FY12 10-K that the Company has "a limited operating history.  Accordingly, [its] historical and recent financial and business results may not necessarily be representative of what such results will be in the future."

33.     Accordingly, in light of these substantial financial risks that greatly impact the Company's cash and financial positions, the Company does not pay dividends to its stockholders. Indeed, as disclosed in the FY12 10-K, the Company "do[es] not expect to pay dividends on shares of [its] common stock in the foreseeable future and [it] intend[s] to use [its] cash position to grow [its] business. Consequently, [stockholders'] only opportunity to achieve a positive return on [their] investment in [Bridgepoint] will be if the market price of [the Company's] common stock appreciates."

### Ashford Risks Losing its Accreditation

34.     The Company derives a substantial portion of its revenue from federal student aid programs ("Title IV Programs") administered by the United States Department of Education ("DoE"). To participate in Title IV Programs, a school must be legally authorized to operate in the state in which it is physically located, accredited by an accrediting agency recognized by the Secretary of the DoE as a reliable indicator of educational quality, and certified as an eligible institution by the DoE. An institution that is certified to participate in Title IV Programs must periodically seek recertification from the DoE to continue participating in such programs.

35.     As the Company disclosed in the 2009 Prospectus, each of its schools was accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools (the "Higher Learning Commission" or "HLC"), which is recognized by the DoE as a reliable authority regarding the quality of education and training provided by the institutions it accredits.

36.     According to the 2009 Prospectus, Ashford was reaccredited by the Higher Learning Commission in 2006 for a term of ten years, and the University of the Rockies was reaccredited by the Higher Learning Commission in 2008 for a term of seven years. The Company further disclosed in the 2009 Prospectus that if either of the Institutions failed to satisfy any of the Higher Learning Commission's standards, it could lose its accreditation. Loss of accreditation would denigrate the value of the Institutions' educational programs and would cause them to lose their eligibility to participate in Title IV Programs, which would have a material

adverse effect on the Company's enrollments, revenues and results of operations.  The Company has repeatedly acknowledged this risk in its historical SEC filings.

37.    Shortly after the Company acquired Ashford, it began an aggressive marketing campaign to increase enrollment, which eventually grew to 84,713 students.  These students were increasingly located in San Diego, California, which was outside the HLC's jurisdiction and endangered Ashford's accreditation when in 2010 the HLC adopted a policy requiring institutions to demonstrate a "substantial presence" in the HLC's region.

38.    This prompted Bridgepoint to seek to obtain accreditation from the Western Association of Schools and Colleges ("WASC") in August 2010.  During the accreditation process, WASC provided Bridgepoint with areas of focus that Bridgepoint needed to address to obtain WASC accreditation, including (a) inadequate student retention and completion, (b) insufficient student progress tracking, (c) an insufficient core of full-time faculty members, and (d) lack of an empowered and independent governing board.

***With Accreditation at Risk, Warburg Seeks To Exit Bridgepoint***

39.    By 2011, Warburg had been an investor in Bridgepoint for seven years, a substantial period of time for a private equity investment, especially having not received a cash distribution since 2009.  On July 22, 2011, the Company filed with the SEC a preliminary Registration Statement on Form S-3 (the "2011 Registration Statement") to register for sale ***all 34,589,220 shares of Bridgepoint common stock owned by Warburg***.  Thus, in the face of the threatened loss of accreditation, which would substantially impair the Company's financial condition, Warburg sought to exit its position in the Company in its entirety.

40.    Warburg's exit strategy was strategically timed.  Not only did the public not yet know of Bridgepoint's pending accreditation difficulties, the Company's stock price was also trading at its all-time high.  After closing at $16.41 per share on April 19, 2011, the Company's stock price surged by more than 85% to close at $30.50 per share on July 22, 2011, the same day the 2011 Registration Statement was filed with the SEC.  However, the market reacted unfavorably to Warburg's intended exit from the Company.  On July 25, 2011, the first trading

day after the 2011 Registration Statement, the Company's stock price closed at $27.01 per share, down more than 11% from the previous day's close.

41.    On August 3, 2011, the Company filed with the SEC a prospectus on Form 424B3 (the "2011 Prospectus") pursuant to which Warburg was to sell its 34,589,220 shares of Bridgepoint common stock and exit the Company.  The 2011 Prospectus stated that Warburg may offer to sell its Bridgepoint shares through public or private transactions at prevailing market prices, at prices related to prevailing market prices, or at privately negotiated prices.  However, by August 8, 2011, the Company's stock price had deteriorated, closing at $19.87 per share that day, as low as $16.52 per share on October 3, 2011.  As of November 13, 2013, Warburg had not sold any shares of Bridgepoint common stock pursuant to the 2011 Prospectus.

***Bridgepoint's Stock Price Crumbles after Investors Learn of Ashford's Accreditation Problems***

42.    On July 3, 2012, WASC delivered an "Action Letter" to Ashford's president and CEO in which WASC advised Ashford that it had failed to demonstrate substantial compliance in multiple areas and WASC would be denying Ashford's accreditation as a result.  Bridgepoint disclosed Ashford's lack of accreditation to investors in a Form 8-K filed with the SEC before the markets opened on July 9, 2012 (the "July 9 8-K").

43.    The Company's stock price declined precipitously following the July 9 8-K.  The Company's stock price closed at $21.50 per share on July 6, 2012, the last trading day before the July 9 8-K, and at $14.25 per share on July 9, a one-day drop of 33.7%.  On July 10, 2012, the Company's stock price closed at $13.07 per share, and by July 26, 2012, the Company's stock price fell to $8.40 per share, down more than 60% from its July 6 trading price.

44.    As a result of this substantial drop in the Company's market price following the disclosure that Ashford would not be accredited, Bridgepoint stockholders commenced in this Court a securities fraud class action entitled *In re Bridgepoint Education, Inc. Securities Litigation,* Case No. 3:12-CV-1737 JM (WMC), seeking damages against the Company, Clark and other Company executives caused as a result of numerous materially false and misleading statements concerning Ashford's accreditation status (the "Securities Action").  On September 13,

2013, the Court granted in part and denied in part defendants' motion to dismiss the Securities Action.

***Bridgepoint's Stock Price Begins to Rise***

45.     Since the July 9 8-K, the Company's stock price has never closed as high as $21.50 per share, its July 6, 2012 closing price.  Indeed, for approximately one year after the July 9 8-K (July 9, 2012 – July 10, 2013), the Company's stock price closed at an average price of $10.57 per share, 50.8% below the July 6, 2011 close and 65.3% below the Company's all-time high on July 22, 2011, the date of the 2011 Registration Statement pursuant to which Warburg announced its intention to exit its position in Bridgepoint.  Thus, even though its 34,589,220 Bridgepoint shares were registered and eligible for sale, Warburg was unable to sell its Bridgepoint shares at a price that provided Warburg with adequate return on its investment.

46.     However, on July 10, 2013, the Company issued a press release in which it announced that WASC had granted Ashford initial accreditation for five years.  Thereafter, on September 5, 2013, the Company issued a press release in which it announced that the HLC removed sanctions against Ashford because Ashford had successfully established accredited status with WASC.  On November 11, 2013, the Company issued a press release in which it announced that the DoE had notified Ashford that it had been approved for accreditation with WASC.  According to the press release, Ashford received this letter from the DoE on November 8, 2013.

47.     Following the July 10, 2013 announcement, the Company's stock price began to rise, and Warburg was presented with a renewed opportunity to sell its Bridgepoint stock.  Indeed, between July 10, 2013 and November 11, 2013, the Company's stock price rose from $12.61 per share to $16.87 per share, an increase of more than 33%.

***The Board Approves the Tender Offer To Benefit Warburg and Themselves***

48.     Before the markets opened on November 13, 2013, Bridgepoint filed with the SEC a Form SC TO-I (the "Schedule TO") to commence the Tender Offer.  The Tender Offer is set to expire on Wednesday, December 11, 2013, at 5:00 p.m. New York City time, unless otherwise extended.

49.    Pursuant to the Schedule TO, the Company is offering to purchase up to 10,250,000 shares of Bridgepoint common stock at a purchase price of $19.50 per share, less applicable withholding taxes and without interest, subject to proration.  However, the Company has "expressly reserve[d] the right to purchase additional shares, up to 2% of [Bridgepoint's] outstanding shares (approximately 1,091,522, based on 54,576,091 shares of [Company] common stock issued and outstanding as of October 31, 2013), without extending the Offer, and could decide to purchase more shares, subject to applicable legal requirements."  Thus, in total, the Company may purchase approximately 11.34 million shares of Bridgepoint common stock in the Tender Offer, and potentially even more.  The Tender Offer is not conditioned upon any minimum number of shares being tendered.

50.    As set forth in the Offer to Purchase filed with the Schedule TO (the "Offer to Purchase"), both Warburg and the Company's officers and directors are eligible to participate in the Tender Offer, and the officers and directors are eligible to tender both their shares and vested stock options.  Indeed, Warburg intends to tender the maximum number of shares it can tender without potentially triggering a change in control of the Company under applicable regulations and accreditation standards, which the Company believes is 8.6 million shares.  In addition, the Company's directors and officers (excluding directors affiliated with Warburg) expect to tender approximately 4.2 million shares of Bridgepoint common stock.  Thus, according to the Offer to Purchase, Warburg (the Company's controlling stockholder) and the Company's officers and directors collectively intend to tender up to *12.8 million* shares, well in excess of the 10.25 million shares announced in the Schedule TO.

51.    According to the Company's annual proxy statement for the Company's 2013 annual meeting of stockholders (the "2013 Proxy"), as of April 2, 2013, the Company's directors and officers (excluding directors affiliated with Warburg), collectively owned approximately 4.2 million shares of Bridgepoint common stock, including approximately 1.9 million exercisable stock options, as follows:

| | Number of Shares Held | Number of Shares Subject to Options | Total Shares Beneficially Owned |
| --- | --- | --- | --- |

| Name of Beneficial Owner | | Exercisable within 60 Days | Number | % |
|---|---|---|---|---|
| **Principal Stockholders** | | | | |
| Warburg Pincus Private Equity VIII, L.P. | 34,589,220 | — | 34,589,220 | 63.9% |
| **Directors and Executive Officers** | | | | |
| Douglas C. Abts | 1,786 | 70,810 | 72,596 | * |
| Thomas Ashbrook | 4,900 | 76,960 | 81,860 | * |
| Andrew S. Clark | 790,996 | 1,140,936 | 1,931,932 | 3.5 % |
| Ryan Craig | 112,076 | 20,744 | 132,820 | * |
| Dale Crandall | 11,400 | 33,317 | 44,717 | * |
| Daniel J. Devine | 83,306 | 404,390 | 487,696 | * |
| Marye Anne Fox | — | 6,807 | 6,807 | * |
| Patrick T. Hackett | 34,589,220 | 20,744 | 34,609,964 | 63.9% |
| Robert Hartman | 11,400 | 64,858 | 76,258 | * |
| Andrew M. Miller | — | 6,428 | 6,428 | * |
| Adarsh Sarma | 34,589,220 | 20,744 | 34,609,964 | 63.9% |
| Diane L. Thompson | 1,816 | 76,960 | 78,776 | * |
| All Directors and Executive Officers as a Group (17 Persons) | 35,780,837 | 3,048,359 | 38,829,196 | 67.9% |

52.     Thus, through the Tender Offer, the Company's officers and directors (including the Individual Defendants not affiliated with Warburg) intend to tender ***their entire positions in the Company,*** including all their exercisable stock options.  Notably, among the directors' and officers' exercisable stock options are options granted on March 31, 2011 at an exercise price of $17.10, which were "out of the money" immediately prior to the announcement of the Tender Offer, when Bridgepoint stock closed at $16.86 per share, but well "in the money" at the Tender Offer price of $19.50 per share.

53.     Assuming Warburg and the Company's directors and officers sell the number of shares stated in the Offer to Purchase, they will reap proceeds of ***$249,600,000***.

54.     According to the Offer to Purchase, the Board created a special committee (the "Special Committee") to review with the Company's management a variety of alternatives for using the Company's available financial resources.  According to the Offer to Purchase, this review resulted in the Board's approval of the Tender Offer to the exclusion of other alternatives. The Offer to Purchase, however, does not disclose, among other things: (1) when the Special Committee was formed; (2) the authority of the Special Committee; (3) the membership of the Special Committee; (4) the members of management who participated in the review; (5) whether the Special Committee actually approved the Tender Offer, or whether Special Committee

approval was required to commence the Tender Offer; (6) how many times the Special Committee met to review the Tender Offer and/or other alternatives; (7) whether the Special Committee retained independent financial and/or legal advisors to review the Tender Offer or alternatives thereto; (8) whether the Special Committee received a fairness opinion in connection with its review of the Tender Offer; or (9) the alternatives reviewed by the Special Committee.

55.     The timing and pricing of the Tender Offer demonstrate that: (1) the Tender Offer is intended to benefit the Company's controlling stockholder, Warburg, and the Company's officers and directors, including the Individual Defendants, at the expense of the Company; and (2) the Special Committee process was a sham.

56.     The $19.50 per share Tender Offer price is grossly excessive in that it represents a substantial and unjustifiable premium to the Company's publicly traded stock price.   The Company's stock price closed at $16.86 per share on November 12, 2013, the last trading day before the announcement of the Tender Offer.   Thus, the Tender Offer represents a 15.7% premium to the Company's closing stock price on November 12, 2013.  Indeed, the $19.50 per share Tender Offer price represents a substantial premium to the Company's average 10-day, 30-day, 60-day, 90-day, 6-month, 12-month and year-to-date closing stock prices up to and including November 12, 2013, the day before the Tender Offer was announced:

|  | 10-Day | 30-Day | 60-Day | 90-Day | 6-Month | 1-Year | YTD |
|---|---|---|---|---|---|---|---|
| Avg. | $17.86 | $18.38 | $17.80 | $17.23 | $15.80 | $13.06 | $13.54 |
| Premium | $1.82 | $1.12 | $1.67 | $2.21 | $3.65 | $6.41 | $5.93 |
| Premium % | **9.16%** | **6.07%** | **9.55%** | **13.17%** | **23.45%** | **49.35%** | **43.97%** |

57.     No economically rational, independent director acting in good faith would agree to purchase a company's publicly traded common stock at a premium to market.  If a board of directors believed in good faith that its stock was worth more than its market price, then it would either purchase the stock at the market price or seek a third party buyer willing to pay a premium to market.

58.     The timing of the Tender Offer also demonstrates that the Tender Offer is intended to benefit Warburg and the Individual Defendants at the expense of the Company.  Warburg has been an investor in Bridgepoint for nearly a decade, but has not extracted money from the

Company since the IPO more than four years ago. And, as the Company has repeatedly disclosed in its SEC filings, Bridgepoint does not intend to issue dividends to its stockholders. Thus, as acknowledged in the FY12 10-K, market sales of the Company's common stock are the only way for stockholders to realize return on their investments in Bridgepoint. Warburg, however, has not sold any shares of Bridgepoint common stock since the IPO despite registering its entire holdings in 2011. Thus, Warburg caused the Board to agree to the market-premium Tender Offer in order to generate cash to return to itself and its investors.

59.     The Tender Offer was announced on the morning of November 13, 2013, indicating that the Board likely approved the Tender Offer on November 12, 2013, only one day after the Company issued its November 11, 2013 press release in which it announced that the DoE had approved Ashford for accreditation with WASC. Thus, the timing of the approval and announcement of the Tender Offer indicates that the Board waited until news of the accreditation reached the markets in an attempt to maximize the price paid to Warburg and the Individual Defendants in the Tender Offer. Furthermore, that the Board approved the Tender Offer within one day of the public announcement of Ashford's accreditation, and four days after Ashford first received news of its accreditation, indicates that the Board was waiting to approve the Tender Offer until such accreditation had been received and that the Special Committee and Board were not actually considering alternatives to the Tender Offer, as asserted in the Offer to Purchase.

60.     Furthermore, the aggregate purchase price of the Tender Offer, assuming the purchase of just the minimum 10,250,000 shares, will be approximately $199 million. As of September 30, 2013, the Company had approximately $432 million in cash and cash equivalents. Thus, the *minimum* aggregate purchase price of the Tender Offer represents *46% of the Company's cash on hand*. The Board's decision to spend such a significant portion of the Company's cash on hand to repurchase Company shares could not possibly have been made in good faith in light of the repeated warnings issued in the FY12 10-K that the Company risks not having sufficient cash on hand to conduct its operations, and that the Company "intend[s] to use [its] cash position to grow [its] business."

61.     Significantly, notwithstanding the pendency of the $19.50 per share Tender Offer, Bridgepoint's stock price has not closed above $18.50 per share since the Tender Offer was announced.

62.     In short, the Individual Defendants approved the Tender Offer to benefit Warburg and the Individual Defendants at the expense of the Company.   The decision to approve the Tender Offer was self-dealing, disloyal, not made in good faith, not protected by the business judgment rule and not entirely fair to Bridgepoint.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

63.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Defendants' breaches of fiduciary duties.

64.     Plaintiff is a stockholder of Bridgepoint, was a stockholder of Bridgepoint at the time of the wrongdoing alleged herein, and has been a stockholder of Bridgepoint continuously since that time.

65.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

66.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

67.     The Board currently consists of seven directors: defendants Clark, Craig, Crandall, Fox, Hackett, Hartman and Sarma.   The following directors are incapable of independently and disinterestedly considering a demand to vigorously prosecute this action:

     a.     Defendants Clark, Craig, Crandall, Fox, Hackett, Hartman and Sarma, *i.e.*, the entire Board, because they knowingly, deliberately, and in bad faith approved the Tender Offer, which was not the product of a valid exercise of business judgment and for which they face a substantial likelihood of liability and are therefore directly interested in the transaction of which Plaintiff complains;

     b.     Defendants Clark, Craig, Crandall, Fox, Hackett, Hartman and Sarma, *i.e.*, the entire Board, because they will be permitted to and intend to tender all their shares of Bridgepoint common stock and all their exercisable

Bridgepoint stock options, and thus stand on both sides of the Tender Offer and will receive a personal financial benefit not available to the public stockholders, who have no exercisable stock options to tender. Moreover, as alleged in detail herein, some of the directors' exercisable stock options have gone from "out of the money" to "in the money" as a result of the inflated Tender Offer price; and

c.     Defendants Hackett and Sarma, because they are employees of Warburg, the Company's controlling stockholder.

68.     Demand is also excused because the Board's decision to approve the Tender Offer was not and could not have been the product of a good faith exercise of business judgment and is not protected by the business judgment rule, but rather is subject to the "entire fairness" standard, which it cannot possibly meet. Warburg, the controlling stockholder of Bridgepoint, had a conflicting self-interest in and stood on both sides of the Tender Offer. Accordingly, the business judgment rule does not protect the Board's decision to approve the Tender Offer. Rather, Defendants bear the burden of proving that the Tender Offer was entirely fair to Bridgepoint, which they have not done and cannot do. As alleged in detail herein, in approving the Tender Offer, the Board failed to act loyally, in good faith, and with due care and instead knowingly acquiesced to Bridgepoint's controlling stockholder Warburg's proposing, negotiating, timing and initiating a transaction that was intended to and did benefit Warburg to the detriment of Bridgepoint. Consequently no demand on the Board is required.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

69.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

70.     Each of the Individual Defendants had a fiduciary duty to, among other things, act in furtherance of the best interests of the Company and its shareholders and not in furtherance of their personal interest or benefit.

71.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by approving the Tender Offer complained of herein, which was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the

Individual Defendants and the Warburg Defendants at the expense of the Company and was not entirely fair to the Company.  Indeed, The Tender Offer was initiated, structured, negotiated and timed for the benefit of Warburg and the Individual Defendants and to the detriment of Bridgepoint.

72.      As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained and will continue to sustain substantial damages.

## COUNT II

### AGAINST THE WARBURG DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

73.      Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

74.      The Warburg Defendants exercise control over the business and affairs of the Company.  As Bridgepoint's controlling stockholder, the Warburg Defendants owe the utmost fiduciary duties of loyalty and care to Bridgepoint.

75.      The Warburg Defendants breached their fiduciary duties of loyalty and care owed to Warburg by causing the Board to approve and commence the Tender Offer.  The Tender Offer was initiated, structured, negotiated and timed for the benefit of Warburg and the Individual Defendants and to the detriment of Bridgepoint.  For the reasons set forth herein, the Tender Offer is not entirely fair to Bridgepoint.

76.      As a direct and proximate result of the Warburg Defendants' breaches of fiduciary duties, the Company has sustained and will continue to sustain substantial damages.

## COUNT III

### AGAINST THE INDIVIDUAL DEFENDANTS AND THE WARBURG DEFENDANTS
### FOR UNJUST ENRICHMENT

77.      Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

78.      The Individual Defendants and the Warburg Defendants have received and will receive excessive and unwarranted payments pursuant to the Tender Offer.

79.    It would be unconscionable and against the fundamental principles of justice, equity and good conscience for the Individual Defendants and the Warburg Defendants to retain the excessive and unwarranted payments they have received and will receive pursuant to the Tender Offer.

### COUNT IV

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR WASTE

80.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

81.    The terms of the Tender Offer are so unfair to the Company that they constitute an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade or conduct a business transaction.

82.    By approving and entering into the Tender Offer, the Individual Defendants wasted the Company's assets.

83.    As a direct and proximate result of the Individual Defendants' waste of corporate assets, the Company has sustained and will continue to sustain substantial damages.

### RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.    Ordering the disgorgement of any proceeds that the Defendants have received and/or will receive as a result of tendering shares of Bridgepoint common stock in the Tender Offer;

B.    Awarding the Company the amount of damages it has sustained and/or will sustain as a result of Defendants' misconduct, together with pre- and post-judgment interest;

C.    Granting appropriate equitable relief to remedy Defendants' misconduct;

D.    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants' and experts' fees; and

E.    Awarding such other and further relief as is just and equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all claims so triable.

Dated: December 9, 2013

Respectfully submitted,

**KESSLER TOPAZ
MELTZER & CHECK, LLP**

Eric L. Zagar (Bar No. 250519)
James H. Miller
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: 610.667.7706
Facsimile: 610.667.7056
E-mail: ezagar@ktmc.com
E-mail: jmiller@ktmc.com

*Attorneys for Plaintiff Carmen Di Giovanni*

## VERIFICATION

I, Carmen DiGiovanni, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: _December 2013_

_Carmen DiGiovanni_
Carmen DiGiovanni