1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE BRIDGEPOINT EDUCATION, INC. SHAREHOLDER DERIVATIVE LITIGATION | CASE NO. 13-cv-2947 JM (JLB) CASE NO. 13-cv-2950 JM (JLB) ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS |

This is a shareholders' derivative suit brought on behalf of nominal Defendant Bridgepoint Education, Inc. ("Bridgepoint") against the members of Bridgepoint's Board of Directors (the "Board") Defendants Andrew S. Clark, Ryan Craig, Dale Crandall, Marye Anne Fox, Patrick T. Hackett, Robert Hartman, and Adarsh Sarma ("Individual Defendants"), and Bridgepoint's controlling stockholder, Warburg Pincus Private Equity VIII, L.P. ("WP VIII") and its affiliates Warburg Pincus & Co., Warburg Pincus LLC, and Warburg Pincus Partners LLC (collectively, "Warburg"). Defendants Bridgepoint, Clark, Craig, Crandall, Fox, and Hartman filed a motion to dismiss Plaintiffs' complaint for failure to first demand action from the corporation's directors prior to bringing a derivative action under Federal Rule of Civil Procedure ("Rule") 23.1(b)(3) and for failure to state a claim under Rule 12(b)(6). (Dkt. No. 13). Defendants Warburg, Hackett, and Sarma filed a notice of joinder in the other Defendants' motion to dismiss, (Dkt. No. 14), as well as their own motion to dismiss

the complaint under Rule 23.1(b)(3) and Rule 12(b)(6), (Dkt. No. 15). The motions have been fully briefed by both sides, and the court finds this matter suitable for resolution on the papers without oral argument pursuant to Civil Local Rule 7.1.d.1. For the reasons set forth below, the motions to dismiss are GRANTED WITH LEAVE TO AMEND.

## BACKGROUND[1]

### I. The Parties

Plaintiffs currently own shares of Bridgepoint common stock, have owned such shares at the time of the events relevant to this action, and will continue to own Bridgepoint common stock throughout this litigation.

Defendant Bridgepoint is a provider of postsecondary education services. It operates two institutions, Ashford University ("Ashford") and University of the Rockies (collectively, the "Institutions"). The Institutions deliver programs primarily online, as well as at their traditional campuses. In total, 81,810 total students were enrolled at the Institutions as of December 31, 2012. The majority of the students at these Institutions attend via accessible online platforms.

Defendant Warburg Pincus Private Equity VIII, L.P. ("WP VIII") is a majority stockholder of Bridgepoint and is managed by Defendant Warburg Pincus LLC. Defendant Warburg Pincus & Co. is the managing member of Defendant Warburg Pincus Partners LLC, which is the sole general partner of WP VIII. As previously noted, these Defendants will be referred to collectively as "Warburg." Warburg is a global private equity firm with offices in the United States, Europe, Brazil, China and India. Warburg has been a private equity investor since 1966 and currently has approximately $35 billion in assets under management and investments in a wide range of sectors.

---

[1] The background consists of Plaintiffs' allegations and, to the extent they are well-pled, are taken as true for purposes of this motion.

Individual Defendants Clark, Craig, Crandall, Fox, Hackett, Hartman, and Sarma served as directors of Bridgepoint during the events relevant to this action. In addition to serving on Bridgepoint's Board, Individual Defendants Hackett and Sarma are also Warburg employees.

## II. Factual Allegations

Bridgepoint was founded in early 2004 by defendant Clark with an initial $20 million investment from Warburg. Warburg's investment was the only outside money that was ever put into Bridgepoint. In 2009, Bridgepoint became publicly traded. In total, 13,500,000 shares of Bridgepoint common stock were sold in the initial public offering ("IPO"), with Warburg selling 9,095,297 shares. After the sale, Warburg retained 34,589,220 shares of Bridgepoint common stock following the IPO and remained Bridgepoint's majority shareholder. Warburg continued to own these shares as of November 13, 2013, comprising 63.4% of Bridgepoint's outstanding common stock.

In the past 6 years, Bridgepoint has realized significant growth, increasing its enrollment from 12,623 students as of December 31, 2007 to 81,810 students as of December 31, 2012, an increase of 548%. As it grew, Bridgepoint expressed concern at various times during this period that its growth might "place a strain on [its] resources" and that "failure to obtain additional capital in the future could adversely affect [its] ability to grow." In light of these concerns, Bridgepoint indicated that it "[did] not expect to pay dividends on shares of [its] common stock in the foreseeable future and [it] intend[ed] to use [its] cash position to grow [its] business. Consequently, [stockholders'] only opportunity to achieve a positive return on [their] investment in [Bridgepoint] [would] be if the market price of [Bridgepoint's] common stock appreciates."

*Ashford's Accreditation*

In 2009, both of Bridgepoint's Institutions were accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools

("HLC"). In order to derive revenue from federal student aid programs ("Title IV Programs") administered by the United States Department of Education ("DoE"), the Institutions must maintain their accreditation. Shortly after Bridgepoint acquired Ashford, it began an aggressive marketing campaign to increase enrollment, which eventually grew to 84,713 students. These students were increasingly located in San Diego, California, which was outside the HLC's jurisdiction and endangered Ashford's accreditation when the HLC adopted a policy in 2010 that required institutions to demonstrate a "substantial presence" in the HLC's region.

This prompted Bridgepoint to seek to obtain accreditation from the Western Association of Schools and Colleges ("WASC") in August 2010. During the accreditation process, WASC indicated to Bridgepoint that there were issues that needed to be addressed in order to obtain WASC accreditation, including (a) inadequate student retention and completion, (b) insufficient student progress tracking, (c) an insufficient core of full-time faculty members, and (d) lack of an empowered and independent governing board.

*Warburg Registers Bridgepoint Stock For Sale*

With Ashford facing the possibility of losing accreditation and the associated revenue from Title IV Programs, Plaintiffs allege that Warburg sought to exit its position in Bridgepoint in its entirety. On July 22, 2011, Bridgepoint filed with the SEC a preliminary Registration Statement on Form S-3 (the "2011 Registration Statement") to register for sale all 34,589,220 shares of Bridgepoint common stock owned by Warburg.

Plaintiffs allege Warburg's exit strategy was strategically timed. By 2011, Warburg had been an investor in Bridgepoint for seven years, a substantial period of time for a private equity investment, particularly given that Warburg had not received a cash distribution since the IPO in 2009. Not only did the public not yet know of Bridgepoint's pending accreditation difficulties when Warburg registered its shares for sale, Bridgepoint's stock price was also trading at its all-time high. After closing at

$16.41 per share on April 19, 2011, the stock price surged by more than 85% to close at $30.50 per share on July 22, 2011, the same day the 2011 Registration Statement was filed with the SEC.

However, Plaintiff contends the market reacted unfavorably to Warburg's intended exit from Bridgepoint. On July 25, 2011, the first trading day after the 2011 Registration Statement, Bridgepoint's stock price closed at $27.01 per share, down more than 11% from the previous day's close. On August 3, 2011, Bridgepoint filed with the SEC a prospectus on Form 424B3 (the "2011 Prospectus") pursuant to which Warburg was to sell its 34,589,220 shares of Bridgepoint common stock and exit Bridgepoint. The 2011 Prospectus stated that Warburg may offer to sell its Bridgepoint shares through public or private transactions at prevailing market prices, at prices related to prevailing market prices, or at privately negotiated prices. However, by August 8, 2011, Bridgepoint's stock price had deteriorated, closing at $19.87 per share that day, and as low as $16.52 per share on October 3, 2011. As of November 13, 2013, Warburg had not sold any shares of Bridgepoint common stock pursuant to the 2011 Prospectus.

*Bridgepoint Stock Prices Fall Following Denial of Accreditation*

On July 3, 2012, WASC informed Ashford's president and CEO that WASC would be denying Ashford's accreditation. On July 9, 2012, Bridgepoint disclosed Ashford's lack of accreditation to investors in a Form 8-K (the "July 9 8-K") filed with the SEC before the markets opened. Bridgepoint's stock price declined precipitously following the July 9 8-K. It closed at $21.50 per share on July 6, 2012, the last trading day before the July 9 8-K, and at $14.25 per share on July 9, a one-day drop of 33.7%. On July 10, 2012, the stock price closed at $13.07 per share, and by July 26, 2012, Bridgepoint's stock price fell to $8.40 per share, down more than 60% from its July 6 trading price.

Following the July 9 8-K, Bridgepoint's stock price has never again closed as high as $21.50 per share, its July 6, 2012 closing price. From July 9, 2012 to July 10,

2013, Bridgepoint's stock price closed at an average price of $10.57 per share, 50.8% below the July 6, 2011 close and 65.3% below Bridgepoint's all-time high stock price on July 22, 2011, when Warburg announced its intention to exit its position in Bridgepoint. Thus, even though Warburg's 34,589,220 Bridgepoint shares were registered and eligible for sale, Plaintiffs allege Warburg was unable to sell its Bridgepoint shares at a price that provided Warburg with adequate return on its investment.

*Bridgepoint Stock Prices Rise Following Ashford's Accreditation*

On July 10, 2013, Bridgepoint issued a press release announcing that WASC had granted Ashford initial accreditation for five years. On September 5, 2013, Bridgepoint issued a press release announcing that the HLC had removed sanctions against Ashford because Ashford had successfully established accredited status with WASC. On November 11, 2013, Bridgepoint issued a press release announcing that the DoE had notified Ashford that it had been approved for accreditation with WASC.

Following the initial announcement of Ashford's WASC accreditation, Bridgepoint's stock price began to rise, and Plaintiff asserts Warburg was presented with a renewed opportunity to sell its Bridgepoint stock. Between July 10, 2013 and November 11, 2013, Bridgepoint's stock price rose from $12.61 per share to $16.87 per share, an increase of more than 33%.

*Bridgepoint's Board Approves a Self-Tender Offer*

Before the markets opened on November 13, 2013, Bridgepoint filed a Form SC TO-I (the "Schedule TO") with the SEC to commence a self-tender offer. Pursuant to the Schedule TO, Bridgepoint offered to purchase up to 10,250,000 shares of Bridgepoint common stock at a purchase price of $19.50 per share, less applicable withholding taxes and without interest, subject to proration.[2] However, Bridgepoint

---

[2] Plaintiffs' complaint was filed prior to the execution of the self-tender offer, and thus does not contain any allegations regarding the actual participation in the tender offer by the Individual Defendants, Warburg, or other Bridgepoint shareholders. While Defendants have referenced participation figures in their briefing and in their

13-cv-2947 JM (JLB)

"expressly reserve[d] the right to purchase additional shares, up to 2% of [Bridgepoint's] outstanding shares (approximately 1,091,522, based on 54,576,091 shares of [Company] common stock issued and outstanding as of October 31, 2013), without extending the Offer, and could decide to purchase more shares, subject to applicable legal requirements." Thus, in total, Plaintiffs allege Bridgepoint could purchase approximately 11.34 million shares of Bridgepoint common stock in the tender offer, and potentially even more. The tender offer was not conditioned upon any minimum number of shares being tendered and was set to expire on Wednesday, December 11, 2013, at 5:00 p.m. New York City time, unless otherwise extended.

As set forth in the Offer to Purchase filed with the Schedule TO (the "Offer to Purchase"), both Warburg and Bridgepoint's officers and directors were eligible to participate in the tender offer, and the officers and directors were eligible to tender both their shares and vested stock options. Warburg indicated its intent to tender the maximum number of shares it can tender without potentially triggering a change in control of Bridgepoint under applicable regulations and accreditation standards, which Bridgepoint asserts is 8.6 million shares. In addition, Bridgepoint's directors and officers (excluding directors affiliated with Warburg) expected to tender approximately 4.2 million shares of Bridgepoint common stock.

In 2013, Bridgepoint's directors and officers (excluding directors affiliated with Warburg), collectively owned approximately 4.2 million shares of Bridgepoint common stock, including approximately 1.9 million exercisable stock options.

request for judicial notice, the court does not take them into account here because proper time to measure demand futility is as of the date the complaint is filed. Rosenbloom v. Pyott, 765 F.3d 1137, 1148 (9th Cir. 2014)("'[F]utility is gauged by the circumstances existing at the commencement of a derivative suit' and concerns the board of directors 'sitting at the time the complaint is filed.'")(quoting In re Am. Int'l Grp., Inc. Derivative Litig., 700 F. Supp. 2d 419, 430 (S.D.N.Y. 2010) (alteration in original) (internal quotation marks omitted), aff'd 415 F. App'x 285 (2d Cir. 2011)); see also In re Bally's Grand Derivative Litigation, 1997 WL 305803, at *3 (June 4, 1997) (citing Harris v. Carter, 582 A.2d 222, 228 (Del. Ch.1990); see also Rales v. Blasband, 634 A.2d 927, 934 (1993); Pogostin v. Rice,, 480 A.2d 619, 624 (Del. 1984); Aronson v. Lewis, 473 A.2d 805, 809-10 (Del. 1984); Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995)).

Through the tender offer, Plaintiffs allege Bridgepoint's officers and directors (including the Individual Defendants not affiliated with Warburg) intended to tender their entire positions by tendering all of their shares in Bridgepoint, including all their exercisable stock options. Plaintiff alleges, among the directors' and officers' exercisable stock options are options with an exercise price of $17.10, which were "out of the money" immediately prior to the announcement of the tender offer when Bridgepoint stock closed at $16.86 per share, but well "in the money" at the tender offer price of $19.50 per share. Thus, according to the Offer to Purchase, Plaintiffs allege Warburg (Bridgepoint's controlling stockholder) and Bridgepoint's officers and directors collectively intend to tender up to 12.8 million shares, well in excess of the 10.25 million shares announced in the Schedule TO. Assuming Warburg and Bridgepoint's directors and officers sell the number of shares stated in the Offer to Purchase, Plaintiffs allege they would reap proceeds of $249,600,000.

According to the Offer to Purchase, the Board created a special committee to review a variety of alternatives for utilizing Bridgepoint's available financial resources with Bridgepoint's management. According to the Offer to Purchase, this review resulted in the Board's approval of the tender offer to the exclusion of other alternatives.

*Plaintiffs' Objections Regarding the Tender Offer*

On the whole, Plaintiffs allege the timing and pricing of the tender offer demonstrate that: (1) the special committee process was a sham; and (2) the tender offer is intended to benefit Bridgepoint's controlling stockholder, Warburg, and Bridgepoint's officers and directors, including the Individual Defendants, at the expense of Bridgepoint itself. First, Plaintiffs allege that the Offer to Purchase fails to disclose, among other things: (1) when the special committee was formed; (2) the authority of the special committee; (3) the membership of the special committee; (4) the members of management who participated in the review; (5) whether the special committee actually approved the tender offer, or whether special committee approval

was required to commence the tender offer; (6) how many times the special committee met to review the tender offer and/or other alternatives; (7) whether the special committee retained independent financial and/or legal advisors to review the tender offer or alternatives thereto; (8) whether the special committee received a fairness opinion in connection with its review of the tender offer; or (9) the alternatives reviewed by the special committee.

Second, Plaintiffs allege the $19.50 per share tender offer price is grossly excessive as it represents a substantial and unjustifiable premium to Bridgepoint's publicly traded stock price. Bridgepoint's stock price closed at $16.86 per share on November 12, 2013, the last trading day before the announcement of the tender offer. Thus, the tender offer represents a 15.7% premium to the closing stock price on November 12, 2013. Moreover, Plaintiffs allege the $19.50 per share tender offer price represents a substantial premium to Bridgepoint's average 10-day, 30-day, 60-day, 90-day, 6-month, 12-month and year-to-date closing stock prices up to and including November 12, 2013, the day before the tender offer was announced:

|  | 10-Day | 30-Day | 60-Day | 90-Day | 6-Mo. | 1-Year | YTD |
|---|---|---|---|---|---|---|---|
| Average | $17.86 | $18.38 | $17.80 | $17.23 | $15.80 | $13.06 | $13.54 |
| Premium | $1.82 | $1.12 | $1.67 | $2.21 | $3.65 | $6.41 | $5.93 |
| Premium % | 9.16 | 6.07 | 9.55 | 13.17 | 23.45 | 49.35 | 43.97 |

Plaintiffs assert that no economically rational, independent director acting in good faith would agree to purchase a company's publicly traded common stock at a premium to market. If a board of directors believed in good faith that its stock was worth more than its market price, Plaintiffs argue it would either purchase the stock at the market price or seek a third-party buyer willing to pay a premium to market. Significantly, notwithstanding the pendency of the $19.50 per share tender offer, Plaintiffs allege Bridgepoint's stock price has not closed above $18.50 per share after the tender offer was announced and prior to the complaint being filed.

Third, Plaintiffs allege the timing of the tender offer demonstrates that it was intended to benefit Warburg and the Individual Defendants at the expense of Bridgepoint itself. Despite having been an investor in Bridgepoint for nearly a decade, Warburg has not extracted money from Bridgepoint since the IPO in 2009. And, as Bridgepoint has repeatedly stated in its SEC filings, it did not intend to issue dividends to its stockholders. Thus, market sales of Bridgepoint common stock would be the only way for stockholders to realize return on their investments in Bridgepoint. Despite having registered its entire holdings for sale in 2011, Warburg has not sold any of its shares of Bridgepoint common stock. Thus, Plaintiffs assert Warburg caused the Board to agree to the market-premium tender offer in order to generate a cash return for itself and its investors.

Fourth, Plaintiffs contend the timing of the approval and announcement of the tender offer indicates that the Board waited until after news of WASC's accreditation reached the market in an attempt to maximize the tender price paid to Warburg and the Individual Defendants. Plaintiffs allege the tender offer was announced on the morning of November 13, 2013, because the Board likely approved the tender offer on November 12, 2013, just one day after Bridgepoint issued its November 11, 2013 press release in which it announced that the DoE had approved Ashford for accreditation with WASC. Plaintiffs argue the Board's approval of the tender offer within one day of the public announcement of Ashford's accreditation, and four days after Ashford first received news of its accreditation, indicates that the Board was waiting to approve the tender offer until the accreditation had been received and that the Special Committee and Board were not actually considering alternatives to the tender offer, as asserted in the Offer to Purchase.

Fifth, Plaintiffs allege the Board's decision to spend such a significant portion of Bridgepoint's cash on hand to repurchase its own shares could not possibly have been made in good faith in light of Bridgepoint's repeated warnings that it faced the risk of not having sufficient cash on hand to conduct its operations, and that

Bridgepoint "intend[ed] to use [its] cash position to grow [its] business." The aggregate purchase price of the tender offer, assuming the purchase of the minimum 10,250,000 shares, would be approximately $199 million. As of September 30, 2013, Plaintiffs allege Bridgepoint had approximately $432 million in cash and cash equivalents. Thus, Plaintiffs assert the minimum aggregate purchase price of the tender offer represents 46% of Bridgepoint's cash on hand.

Based on these allegations, Plaintiffs argue the Individual Defendants approved the tender offer to benefit Warburg and the Individual Defendants at the expense of Bridgepoint. As a result, Plaintiffs contend the decision to approve the tender offer was self-dealing, disloyal, not made in good faith, not protected by the business judgment rule and not entirely fair to Bridgepoint.

_Allegations Regarding the Futility of Making a Demand for Action on the Board_

Plaintiffs bring this action derivatively on behalf of Bridgepoint based upon Defendants' alleged breach of their fiduciary duties. Plaintiffs acknowledge that they have not made a demand on the Board to institute this action against the Individual Defendants as required by Rule 23.1(b)(3), but instead argue that such a demand would have been a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

Bridgepoint's Board consists of seven directors: Individual Defendants Clark, Craig, Crandall, Fox, Hackett, Hartman, and Sarma. Plaintiffs allege these directors are incapable of independently and disinterestedly considering a demand to vigorously prosecute this action for the following reasons. First, Plaintiffs allege the Individual Defendants knowingly, deliberately, and in bad faith approved the tender offer, which was not the product of a valid exercise of business judgment and for which they face a substantial likelihood of liability and are therefore directly interested in the challenged tender offer. Second, Plaintiffs allege the Individual Defendants intend to tender all their shares of Bridgepoint common stock and all their exercisable Bridgepoint stock options in the tender offer, and thus stand on both sides of the

transaction and will receive a personal financial benefit not available to public stockholders who do not have exercisable stock options to tender. Plaintiffs argue this is particularly true because some of the directors' exercisable stock options have gone from "out of the money" to "in the money" as a result of the allegedly inflated tender offer price. Third, Plaintiffs allege that Defendants Hackett and Sarma are incapable of independently and disinterestedly considering a demand to prosecute this action because they are also employees of Warburg.

Plaintiffs allege demand is also excused because the Board's decision to approve the tender offer was not the product of a good faith exercise of business judgment and is therefore not protected by the business judgment rule. Rather, Plaintiffs allege the approval of the tender offer is subject to the "entire fairness" standard. Plaintiffs argue the tender offer does not meet this standard because Warburg, the controlling stockholder of Bridgepoint, had a conflicting self-interest in the transaction and thus stood on both sides of the tender offer. Accordingly, Plaintiffs assert the business judgment rule does not protect the Board's decision to approve the tender offer, and Defendants bear the burden of proving that the tender offer was entirely fair to Bridgepoint. In approving the tender offer, Plaintiffs contend the Board failed to act loyally, in good faith, and with due care and instead knowingly acquiesced to Bridgepoint's controlling stockholder Warburg's proposing, negotiating, timing and initiating a transaction that was intended to and did benefit Warburg to the detriment of Bridgepoint. For these reasons, Plaintiffs allege demand on the Board would have been futile and was therefore not required before filing this derivative action.

Based upon these factual allegations, Plaintiffs brought this derivative action on behalf of Bridgepoint. In the complaint, Plaintiffs allege four claims: Count I against the Individual Defendants for Breach of Fiduciary Duty; Count II against the Warburg Defendants for Breach of Fiduciary Duty; Count III against all the Defendants for Unjust Enrichment; and Count IV against the Individual Defendants for Waste. Defendants seek to dismiss Plaintiffs' complaint based upon Plaintiffs' failure to first

13-cv-2947 JM (JLB)

make a demand for action on the Board as required by Rule 23.1 and the complaint's failure to state a claim under Rule 12(b)(6).[3]

## LEGAL STANDARD

### I. Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion to dismiss challenges the legal sufficiency of the pleadings. Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). When considering a Rule 12(b)(6) motion to dismiss, the court must construe the pleadings in the light most favorable to the non-moving party, accepting as true all material allegations in the complaint and any reasonable inferences drawn therefrom. See, e.g., Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003). While dismissal is proper only in "extraordinary" cases, United States v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981), the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The court should grant relief under Rule12(b)(6) only if the complaint lacks either a "cognizable legal theory" or facts sufficient to support a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).

### II. Federal Rule of Civil Procedure 23.1 and the Demand Futility Requirement

Ordinarily, the decision whether to institute a lawsuit on a corporation's behalf belongs to the corporation's board of directors. Potter v. Hughes, 546 F.3d 1051, 1058 (9th Cir. 2008). "The derivative form of action permits an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties.'" Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 95 (1991) (quoting Ross v. Bernhard, 396 U.S. 531, 534 (1970)) (emphasis omitted); see also Rosenbloom v. Pyott, 765 F.3d 1137, 1147 (9th Cir. 2014). "Devised as a suit in equity, the purpose of the derivative action [is] to place in the hands of the individual shareholder a means

---

[3] In addition to their motions to dismiss, Defendants submitted requests for judicial notice. (Dkt. Nos. 13-2 and 15-3). Insomuch as the court's consideration of demand futility was limited to the allegations within Plaintiffs' complaint, the court denies without prejudice Defendants' requests for judicial notice as moot under the circumstances.

to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" Id. (quoting Cohen v. Beneficial Loan Corp., 337 U.S. 541, 548 (1949)).

Pursuant to Federal Rule of Civil Procedure 23.1, a shareholder plaintiff who brings a derivative suit against the board of directors on behalf of the corporation must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors . . . and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). "The purpose of this demand requirement in a derivative suit is to implement 'the basic principle of corporate governance that the decisions of a corporation—including the decision to initiate litigation—should be made by the board of directors or the majority of shareholders." Rosenbloom, 765 F.3d at 1148 (internal quotations omitted). While Rule 23.1 provides the pleading standard for assessing allegations of demand futility, the demand requirements for a shareholder derivative suit are determined by the law of the state of incorporation. Rosenbloom, 765 F.3d at 1148; Kamen, 500 U.S. 90, 96 (1991) ("the function of the demand doctrine . . . is a matter of 'substance' not 'procedure'. . . . [Courts] must apply the demand futility exception as it is defined by the law of the state of incorporation"); Potter v. Hughes, 546 F.3d 1051, 1054 n. 1 (9th Cir. 2008) ("the substantive demand requirement is an issue of state law"). Because Bridgepoint is incorporated in Delaware, the court applies Delaware law to determine whether demand is excused under the facts as alleged in the complaint. Rosenbloom, 765 F.3d at 1148; In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 989-90 (9th Cir. 1999) (citing Kamen, 500 U.S. at 96)).

Under Delaware law, "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability." Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984) (overruled on other grounds). Where a plaintiff challenges an affirmative decision by the board of directors, Delaware provides a two-part, disjunctive test for demand futility:

The first prong of the futility rubric is whether, under the particularized facts alleged, a reasonable doubt is created that . . . the directors are disinterested and independent. The second prong is whether the pleading creates a reasonable doubt that the challenged transaction was otherwise the product of a valid exercise of business judgment. These prongs are in the disjunctive. Therefore, if either prong is satisfied, demand is excused.

Brehm v. Eisner, 746 A.2d 244, 256 (Del. 2000)(citing Aronson, 473 A.2d at 814, 816); Rosenbloom, 765 F.3d at 1149. When considering demand futility, plaintiffs "are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences.'" Rosenbloom, 765 F.3d at 1148 (quoting Brehm, 746 A.2d at 255).

## DISCUSSION

### I. Demand Futility

Defendants' primary argument in favor of their motion to dismiss is that Plaintiffs failed to make a demand on Bridgepoint's Board and failed to adequately plead why demand would be futile. (Bridgepoint MTD at 14 (Dkt. No. 13)). "As an initial matter, the court acknowledges that '[e]ach derivative claim for which no demand was made on the board must be evaluated independently to determine whether demand was futile as to that claim.'" Resnik v. Woertz, 774 F. Supp. 2d 614, 635 (D. Del. 2011)(quoting MCG Capital Corp. v. Maginn, 2010 WL 1782271, at *7 (Del. Ch. May 5, 2010)). However, because all of the claims which are the subject of this motion to dismiss are based on the self-tender offer, the same analysis addresses demand futility for all of Plaintiffs' claims.

### A. Aronson's First Prong: Disinterest of the Board

Under the first prong of Aronson, the court must determine whether Plaintiffs' factual allegations create a reasonable doubt that the majority of the Board was

/ / /

/ / /

/ / /

- 15 -

disinterested in the tender offer at the time the complaint was filed.[4]  A "director's interest may be shown by demonstrating a potential personal benefit or detriment to the director as a result of the decision." <u>Rosenbloom</u>, 765 F.3d at 1149 (internal quotations and citations omitted).  As set forth in <u>Aronson</u>, this means "that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." <u>Aronson</u>, 473 A.2d at 812; <u>see also</u> <u>Orman v. Cullman</u>, 794 A.2d 5, 22-23 (Del. Ch. 2002).  Similarly, directors may have a disabling interest for demand futility purposes when there is a substantial likelihood of personal liability related to the challenged transaction. <u>Rosenbloom</u>, 765 F.3d at 1149.

When analyzing whether a director is "interested" for demand purposes, courts examine the specific transaction being challenged. <u>See</u> <u>Abrams v. Wainscott</u>, 2012 WL 3614638, at *2 (D. Del. Aug. 21, 2012) ("The demand futility analysis proceeds transaction-by-transaction.") (citing <u>Khanna v. McMinn</u>, 2006 WL 1388744, at *14 (Del. Ch. May 9, 2006)).  In order for demand to be futile under the first <u>Aronson</u> prong, a majority of the board members, or one-half of an evenly-numbered board, must be interested.  <u>See</u> <u>Beam v. Stewart</u>, 845 A.2d 1040, 1046 n.8 (Del. 2004).

Here, Plaintiffs contend that all of the Individual Defendants were interested in the self-tender because: (1) the Individual Defendants stood on both sides of the tender offer, (2) the Individual Defendants received benefits from the tender offer not shared by other stockholders, and (3) the Individual Defendants faced a substantial likelihood of future liability relating to their approval of the tender offer.

/ / /

---

[4]  Lack of independence may also establish demand futility under the first prong of <u>Aronson</u>. Plaintiff points out in the complaint that two of the seven directors were also employees of Warburg, the controlling shareholder.  However, two directors do not constitute a majority of the Board, and Plaintiffs have not argued that a majority of the Individual Defendants were not independent so the court need not address directorial independence herein.

13-cv-2947 JM (JLB)

**1. Standing on Both Sides of the Tender Offer**

In approving the tender offer, the complaint alleges the Individual Defendants intended to tender their entire positions in Bridgepoint, including all their exercisable stock options, at a price above the existing market premium. (Compl. ¶¶ 52, 56). As a result, Plaintiffs argue the Individual Defendants "both approved the Tender Offer as buyers and were eligible to and intended to participate in the Tender Offer as sellers, and thus they each stood on both sides of the Tender Offer," regardless of whether they received any special benefit which was not also extended to all the other shareholders. (Compl. ¶ 67(b); Pls. Resp. 11).

In <u>Orman v. Cullman</u>, the Delaware Supreme Court provided the following insight regarding the types of "interest" that may be held by a corporate director. 794 A.2d at 25 n. 50.

> [A] disabling "interest," as defined by Delaware common law, exists in two instances. The first is when (1) a director personally receives a benefit (or suffers a detriment), (2) as a result of, or from, the challenged transaction, (3) which is not generally shared with (or suffered by) the other shareholders of his corporation, and (4) that benefit (or detriment) is of such subjective material significance to that particular director that it is reasonable to question whether that director objectively considered the advisability of the challenged transaction to the corporation and its shareholders. The second instance is when a director stands on both sides of the challenged transaction. . . . This latter situation frequently involves the first three elements listed above. As for the fourth element, whenever a director stands on both sides of the challenged transaction he is deemed interested and allegations of materiality have not been required.

<u>Orman</u>, 794 A.2d at 25 n. 50 (citing 8 Del. C. § 144). Contrary to Plaintiffs' argument, <u>Orman</u> suggests that the receipt of a benefit not generally shared with other shareholders is frequently a factor when determining whether a director stands on both sides of the challenged transaction. <u>See also</u> <u>Aronson</u>, 473 A.2d at 812 (citing <u>Sinclair Oil Corp. v. Levien</u>, 280 A.2d 717, 720 (Del. 1971)(defining "self-dealing" as "when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary"); <u>Cheff v. Mathes</u>, 199 A.2d 548, 554 (Del. 1964)(Unlike "directors [that] have the same 'self-dealing interest'

as is present, for example, when a director sells property to the corporation," the fact that "other directors were substantial shareholders does not create a personal pecuniary interest in the decisions made by the board of directors, since all shareholders would presumably share the benefit flowing to the substantial shareholder."); David J. Greene & Co. v. Dunhill International, Inc., 249 A.2d 427, 430 (1968)(finding directors stood on both sides of the merger between a subsidiary and its parent corporation when the directors served as directors for both the subsidiary and the parent corporation, the subsidiary's majority shareholder)). Accordingly, relevant case law on whether directors "stand on both sides" of a transaction, does not support Plaintiffs' characterization of the Individual Defendants' position as standing on both sides of the tender offer in this case.

Plaintiffs analogize the facts of this case to a number of other cases in which demand was excused because a majority of the corporation's board members stood on both sides of transactions with Bridgepoint. (See Pls. Resp. 11-12). However, as Defendants point out, these cases all involved some direct benefit received by the directors that was not extended to other shareholders, usually through a contract providing for director compensation, bonuses, or stock options. See Warhanek v. Bidzos, 2013 WL 5273112, at *8 (D. Del. Sept. 18, 2013)(finding "demand would be futile as to all claims premised on the Director Defendants' ability to award themselves compensation under the 2011 Equity Plan"); Seinfeld v. Slager, 2012 WL 2501105, at *12 (Del. Ch. June 29, 2012)(finding plaintiff sufficiently pled demand futility with regard to the board of director's "self-interested decision to award bonuses to Board members"); Resnik v. Woertz, 774 F. Supp. 2d 614, 635 (D. Del. 2011)(determining board members lacked independence to consider a plan that provided substantial compensation benefits for each of the board members); Hoch v. Alexander, 2011 WL 2633722, at *6 (D. Del. July 1, 2011) (finding plaintiff "properly challenged [board of directors] independence" as they were all eligible to participate in the stock-based compensation and receive performance awards created by a long term incentive plan);

13-cv-2947 JM (JLB)

and <u>London v. Tyrrell</u>, 2008 WL 2505435, at *5 (Del. Ch. June 24, 2008)(concluding defendant directors who both granted and received the challenged stock options stood on both sides of the transaction under the <u>Aronson</u> test despite the general rule holding that "demand is not excused simply because directors receive compensation from the company or an executive of the company").[5]  In contrast to these cases, the tender offer challenged by Plaintiffs here does not provide for any compensation, bonuses, or stock options to be provided to the Individual Defendants as board members.  As a result, the cases relied upon by Plaintiffs are of limited relevance.

Alternatively, Defendants offer the Delaware Supreme Court's decision in <u>Gilbert v. El Paso Co.</u> as authority for finding the Individual Defendants did not stand on both sides of the tender offer.  575 A.2d 1131, 1146 (Del. 1990).  In <u>Gilbert</u>, the Delaware Supreme Court noted it was undisputed that the board members' arrangement of a tender offer from another company to buy the corporation's shares, into which the board could tender their own shares, did not stand on both sides of the transaction.  <u>Id.</u> It further held that "by tendering into the January offer, no board member received any special benefit which was not also extended to all shareholders in which the court found approval of and subsequent participation in, a tender offer did not render the defendants interested in the transaction."  <u>Id.</u>

Plaintiffs counter <u>Gilbert</u> is inapposite because (1) <u>Gilbert</u> involved a hostile tender offer to a third-party rather than a self-tender offer like the one in this case, and (2) <u>Gilbert</u> was a class action brought on behalf of the stockholders rather than a derivative suit brought on behalf of the corporation.  However, in making both of these arguments, Plaintiffs have not provided any legal authority for distinguishing <u>Gilbert</u> on these grounds.  It is unclear how the Individual Defendants in this case should be

---

[5] The court notes that many of the cases relied upon by the parties in their briefing, and thus also considered by the court herein, are unpublished decisions from the Delaware Court of Chancery.  While these cases are "not necessarily *stare decisis*," they nevertheless warrant "great deference" when considering factually similar circumstances.  <u>Aprahamian v. HBO & Co.</u>, 531 A.2d 1204, 1207 (Del. Ch. 1987)(citing <u>State v. Phillips</u>, 400 A.2d 299, 308 (1979)).

considered as standing on both sides of the offer by virtue of the transaction being a self-tender offer when the Individual Defendants in <u>Gilbert</u> were not standing on both sides of a hostile tender offer. In both instances, the board members owe a fiduciary duty to both the company and its shareholders while also having the ability to participate in the offer by tendering their own shares. Similarly, while Plaintiffs argue <u>Gilbert</u> and several of the cases relied upon by Defendants are inapposite by virtue of their being class actions rather than derivative suits, they have provided neither justification nor authority for making this distinction. (Pls. Resp. 12-14). Rather, Plaintiffs simply conclude that cases involving shareholder class actions are inconsequential to derivative suits of the type brought here.

Having considered the factors listed in <u>Orman</u> as well as relevant case law, the court concludes Plaintiffs have insufficiently pled the Individual Defendants stand on both sides of the transaction simply by both approving the offer and intending to participate in a manner available to all other shareholders.[6]

## 2. Receiving Unshared Benefits

Plaintiffs further allege the Individual Defendants were interested under <u>Aronson</u> because they received benefits from the tender offer not shared by other stockholders. Specifically, Plaintiffs allege the Individual Defendants were eligible to exercise and sell into the tender offer Bridgepoint stock options that were otherwise underwater. (Compl. ¶ 67(b); Pls. Resp. 14). "[A]mong the directors' and officers' exercisable stock options are options granted on March 31, 2011 at an exercise price of $17.10, which were "out of the money" immediately prior to the announcement of the Tender

---

[6] When considering whether a director stood on both sides of a transaction, Plaintiffs suggest it is immaterial whether the director received any special benefit from the transaction that is unshared with other shareholders. (Pls. Resp. 12). However, the receipt of a special benefit is one of the factors to consider when determining whether board members stood on both sides of the challenged transaction under Delaware law. <u>Orman</u>, 794 A.2d at 25 n. 50. Thus, as in several of the cases relied upon by Plaintiffs as support for finding the Individual Defendants stood on both sides of the transaction, courts considering compensation, bonuses, and stock dividends available only to board members found demand futility, in part, because the defendants were interested by virtue of receiving special benefits that were not shared with other shareholders.

Offer, when Bridgepoint stock closed at $16.86 per share, but well "in the money" at the Tender Offer price of $19.50 per share." (Compl. ¶ 52). Plaintiffs argue the ability to sell the shares from their "out of the money" or "underwater" options at a profit constitutes a benefit to the Individual Defendants that was not shared with other Bridgepoint shareholders, rendering the Individual Defendants interested in the tender offer under <u>Aronson</u>. (Pls. Resp. at 14).

In <u>Feldman v. Cutaia</u>, Plaintiffs contend the Delaware Court of Chancery considered a similar factual scenario and held that demand was futile where a company's board of directors set the price of a self-tender transaction above fair value in order to impart value to their otherwise underwater options and warrants. 2006 WL 920420, at *1 (Del. Ch. Apr. 5, 2006). In reaching this decision, the court in <u>Feldman</u> carefully identified specific factual allegations from the complaint that it found significant when determining the directors were interested in the tender offer under <u>Aronson</u>. For instance, although the stock in the corporation had never sold for more than $4 per share, the directors arranged a self-tender offer at the price of $10 per share as well as "$10 per option and warrant minus the underlying applicable exercise price." <u>Id.</u> The directors also structured the offer so that shareholders who held options and warrants in addition to common stock could tender their options and warrants first. <u>Id.</u> Plaintiff in <u>Feldman</u> further alleged that the directors owned approximately 89% of the corporation's outstanding options and warrants, which were fully vested with exercise prices ranging from $0.10 to $3.40. <u>Id.</u> at * 4. The plaintiff also alleged that the "number of options and warrants eligible for repurchase was substantial" and "greater than the total amount of common stock outstanding." <u>Id.</u> at *6 n. 36. Additionally, "given the structure and terms of the repurchase, the defendants could tender their otherwise underwater options and warrants and receive a significant amount of the proceeds without diluting their ownership interest in the company." <u>Id.</u> at *5. The court also noted that the directors had acknowledged in the disclosure document that the board had been exploring a possible merger transaction with a third party or another

recapitalization, which meant that the tender offer afforded the individual defendants the opportunity to cash in a significant portion of their holdings at a per share value that they knew would not be available in a negotiated transaction with a third party such as a merger or recapitalization. Id. at *6 n. 39. In addition, plaintiff's allegation that the company did not disclose why the directors chose a $10 repurchase price or how this price was calculated further supported the suggestion that the directors had an improper motive to cash out their less valuable (or valueless) options and warrants at an inflated price. Id. at *6. Based on these "particularized allegations of fact" in the complaint, the Feldman court concluded that there was a "reasonable probability that a majority of the Telx directors were financially interested in the repurchase and stand to receive a financial benefit not equally shared by the company's stockholders." Id. at * 6.

It is immediately evident the Feldman court based its findings of director interest upon very specific factual allegations. Although Plaintiffs herein characterize this case as having "nearly identical circumstances" to those in Feldman, there are important factual distinctions. For example, Plaintiffs herein have not alleged that the Individual Defendants structured the tender offer to provide themselves with advantages over other shareholders of the type alleged in Feldman. Specifically, Plaintiffs have not alleged that the tender offer allows the directors to tender their options directly; that the structure of the tender offer allows the directors to first tender their options in the repurchase without a concomitant reduction of their ownership percentage in the company; that the amount of options available for tender was greater than the total amount of outstanding common stock; or that the directors were motivated by the possibility of a merger or recapitalization in the near future. See Pfeffer v. Redstone, 2008 WL 308450, at *7 (Del. Ch. Feb. 1, 2008) affirmed 965 A.2d 676 (Del. 2009)(distinguishing Feldman where there was nothing to suggest that the directors structured the challenged transaction to put their own interests above those of either the company or any identifiable group of stockholders). Moreover, the tender offer price

in Feldman was 150% higher than the fair market value of the stock at any point prior to the repurchase. In contrast, Plaintiffs herein allege the tender offer represented a market premium of 15.7% above the closing price on November 12, 2013 and a 49.35% market premium to Bridgepoint's 12-month average closing stock prices.[7] (Compl. ¶ 56). While not addressed in Plaintiffs' briefing, the court finds these factual distinctions significant when weighing the applicability of Feldman to the facts in this case.

Of more immediate concern, however, is Plaintiffs' failure to identify in the complaint which of the Individual Defendants held the allegedly "underwater" options and how many allegedly "underwater" options there were. The complaint generally alleges that, "among the directors' and officers' exercisable stock options are options granted on March 31, 2011, at an exercise price of $17.10, which were 'out of the money' immediately prior to the announcement of the Tender Offer, when Bridgepoint stock closed at $16.86 per share, but well 'in the money' at the Tender Offer price of $19.50 per share." (Compl. ¶ 52). No further detail regarding the allegedly "underwater" options is provided. In order to determine if demand is excused based upon directorial self-interest, the court must be able to assess whether a majority of the directors would receive a benefit from the tender offer of such subjective material significance that it is reasonable to question whether those directors objectively considered the advisability of the challenged transaction to the corporation and its shareholders. See Orman, 794 A.2d at 25 n. 50 (citing 8 Del. C. § 144). The complaint is currently fatally deficient in setting forth the specific amount of the "underwater" options.

Accordingly, the court concludes Plaintiffs have insufficiently alleged that the Individual Defendants were interested in the transaction by receiving unshared special benefits from the tender offer.

---

[7] The lowest market premium percentage alleged by Plaintiffs is 6.07% based upon Bridgepoint's 30-day average closing prices. (Compl. ¶ 56).

### 3. Likelihood of Future Liability

Plaintiffs' complaint also broadly alleges that the Individual Defendants "knowingly, deliberately, and in bad faith approved the Tender Offer, which was not the product of a valid exercise of business judgment and for which they face a substantial likelihood of liability."[8] (Compl. ¶ 67(a)). As set forth above, demand futility may be established if a majority of the directors faced a substantial likelihood of personal liability resulting from the challenged transaction. Rosenbloom, 765 F.3d at 1150. "To meet that standard when presented with a motion to dismiss under Rule 23.1, plaintiffs must make 'a threshold showing, through the allegation of particularized facts, that their claims have some merit.'" Id. at 1149 (quoting Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993)).

Having reviewed Plaintiffs' allegations, the complaint does not contain particularized facts necessary to provide a threshold showing that Plaintiffs claims have some merit. In Count I, Plaintiffs allege the Individual Defendants breached their fiduciary duty by approving a tender offer that was "initiated, structured, negotiated and timed" to unduly benefit the Defendants at the expense and to the detriment of Bridgepoint itself.[9] (Compl. ¶¶ 71). As currently pled, Plaintiffs' breach of fiduciary duty claim rests upon Plaintiffs' allegations that the Defendants were self-interested in the tender offer. As discussed above, Plaintiffs' factual allegations of self-interest in the tender offer predicated upon either (1) standing on both sides of the transaction or (2) receiving unshared benefits from the tender offer fall short of what is required. Accordingly, Plaintiffs have not made a threshold showing, through alleging

---

[8] Notably, this is the sole reference to the Individual Defendants' substantial likelihood of facing liability in the compliant, and Plaintiffs make no argument regarding this allegation in their briefing.

[9] Count II alleges breach of fiduciary duty against the Warburg Defendants. Because the complaint does not allege that the Warburg Defendants faced a substantial likelihood of future liability, the court need not consider whether Plaintiffs have made a showing that their claim against the Warburg Defendants has some merit. For the same reason, the court considers Plaintiffs' unjust enrichment claim in Count III solely as it pertains to the Individual Defendants and their potential liability.

particularized facts, that their breach of fiduciary duty claim has some merit.

In Count III, Plaintiffs allege unjust enrichment against the Individual Defendants based upon the "excessive and unwarranted payments" they will receive pursuant to the tender offer. (Compl. ¶ 78). Under Delaware law, an unjust enrichment claim requires plaintiffs to plead "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 393 (Del. Ch. 1999). As explained in their briefing, Plaintiffs' unjust enrichment claim alleges the tender offer was conducted without legal justification because it was "a self-dealing transaction that was conducted for the purpose of allowing the Individual Defendants to sell to the Company shares of Bridgepoint common stock, including shares obtained upon the exercise of otherwise underwater stock options, at an unfairly high price." (Pls. Resp. 23). Here again, Plaintiffs' claim is premised entirely upon the Defendants' alleged self-interest in the tender offer. As Plaintiffs have failed to allege that the Defendants were self-interested in the tender offer by either standing on both sides of the transaction or receiving unshared benefits from the tender offer, Plaintiffs have similarly failed to make a threshold showing of particularized factual allegations that their unjust enrichment claim has some merit.

In Count IV, Plaintiffs assert a waste claim against the Individual Defendants, alleging the "terms of the Tender Offer are so unfair to [Bridgepoint] that they constitute an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade or conduct a business transaction." (Compl. ¶ 81). "Delaware law provides stringent requirements for a plaintiff to state a claim for corporate waste," and the "test to show corporate waste is difficult for any plaintiff to meet." In re Citigroup Inc. S'holder Derivative Litig., 964 A.2d 106, 136 (Del. Ch. 2009).

> Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any

> reasonable person might be willing to trade. Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift. If, however, there is any substantial consideration received by the corporation, and if there is a good faith judgment that in the circumstances the transaction is worthwhile, there should be no finding of waste, even if the fact finder would conclude ex post that the transaction was unreasonably risky. Any other rule would deter corporate boards from the optimal rational acceptance of risk, for reasons explained elsewhere. Courts are ill-fitted to attempt to weigh the "adequacy" of consideration under the waste standard or, ex post, to judge appropriate degrees of business risk.

Brehm, 746 A.2d at 263 (quoting Lewis v. Vogelstein, 699 A.2d 327, 336 (Del. Ch. 1997)(emphasis in original)(citations omitted)). To prevail on a waste claim, the plaintiff "must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." White v. Panic, 783 A.2d 543, n. 36 (Del. 2001); see also Brehm, 746 A.2d at 263.

Here, outside of alleging self-interest on the part of Defendants, Plaintiffs' complaint primarily challenges the timing and pricing of the tender offer, which essentially consists of a disagreement with the Board's choices in structuring and approving the tender offer. Plaintiffs object to the amount of cash on hand spent by Bridgepoint and the allegedly excessive price of the shares. In doing so, Plaintiffs challenge the business risks associated with the Board's decision, but the appropriate degree of business risk is not the basis of a waste claim. Rather, it is a question of business judgment generally reserved for the Board and afforded discretion by the court. Considering the stringent requirements for alleging a waste claim, Plaintiffs' allegations fall short of the mark.

As the waste claim now stands, the Board made a business decision to approve a self-tender offer. Plaintiffs obviously disagree with the Board's judgment as to how this matter should have been handled. "But where, as here, [allegations do not create a] reasonable doubt as to the disinterest of or absence of fraud by the Board, mere disagreement cannot serve as grounds for imposing liability based on alleged breaches

of fiduciary duty and waste." <u>Brehm</u>, 746 A.2d at 266 (quoting <u>In re Walt Disney Co.</u> <u>Derivative Litigation</u>, 731 A.2d 342, 362 (Del. Ch. 1993)). "To rule otherwise would invite courts to become super-directors, measuring matters of degree in business decisionmaking and executive compensation.  Such a rule would run counter to the foundation of our jurisprudence."  <u>Brehm</u>, 746 A.2d at 266.  For these reasons, Plaintiffs have insufficiently alleged that the Individual Defendants were interested in the tender offer based upon the alleged substantial likelihood of future liability.

On the whole, Plaintiffs have not alleged particularized facts that create a reasonable doubt that the majority of the Board was disinterested in the tender offer at the time the complaint was filed.  As a result, Plaintiffs have not sufficiently pled demand futility under the first prong of <u>Aronson</u>.

**B.  <u>Aronson</u>'s Second Prong: Applicability of the Business Judgment Rule**

Generally, to determine whether demand is excused under the second prong of <u>Aronson</u>, the court must consider whether Plaintiffs' factual allegations create a reasonable doubt that the transaction was the product of a valid exercise of business judgment.  <u>Brehm</u>, 746 A.2d at 256 (citing <u>Aronson</u>, 473 A.2d at 814); <u>Rosenbloom</u>, 765 F.3d at 1149.  "The good faith business decisions of informed, disinterested, and independent directors of Delaware corporations are entitled to deference under the business judgment standard of review."  <u>Rosenbloom</u>, 765 F.3d at 1149 (internal quotation marks omitted).  However, Plaintiffs argue that Warburg, Bridgepoint's controlling stockholder, stood on both sides of the tender offer, and therefore Defendants must demonstrate that the Tender Offer was entirely fair to Bridgepoint. (Compl. ¶ 68; Pls. Resp. 17).  Applying the entire fairness standard rather than the typical business judgment rule, Plaintiffs argue demand is excused under the second prong of <u>Aronson</u>.  In making this argument, Plaintiffs rely upon the following language from the Delaware Supreme Court's decision in <u>Kahn v. Tremont Corp.</u>:

> [I]n a challenged transaction involving self-dealing by a controlling shareholder the substantive legal standard is that of entire fairness, with the burden of persuasion resting upon the defendants. . . . Regardless of where the burden lies, ***when a controlling shareholder stands on both***

*sides of the transaction the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard.*

(Pls. Resp. 17 (quoting 694 A.2d 422, 428 (Del. 1997) (citations omitted, emphasis added)). Plaintiffs contend the Delaware Supreme Court reiterated this standard in two other recent cases, and therefore the court should employ the entire fairness standard here as well. See Kahn v. M&F Worldwide Corp., 2014 WL 996270, at *4 (Del. Mar. 14, 2014); Americas Mining Corp. v. Theriault, 51 A.3d 1213, 1240 (Del. 2012).

Notably, the cases relied upon by Plaintiffs involve either interested mergers of subsidiaries with their parent companies or the acquisition of shares by one company associated with the controlling shareholder from another company associated with the controlling shareholder. See Kahn v. M & F Worldwide Corp., 88 A.3d at 642 (considering the proper standard of review for mergers between a controlling stockholder and its corporate subsidiary in certain circumstances); Americas Mining Corp. v. Theriault, 51 A.3d at 1240-49 (applying entire fairness standard to a corporation's purchase of controlling interest in Mexican mine, which was owned by corporation's controlling shareholder); Kahn v. Tremont Corp., 694 A.2d at 428-29 (applying entire fairness standard to the sale of a partial interest in a corporation controlled by an individual shareholder to a second corporation controlled by same shareholder); In re China Agritech, Inc. S'holder Derivative Litigation, 2013 WL 2181514, at *17 (Del. Ch. May 21, 2013) (applying entire fairness standard and finding demand futility where defendants' company purchased shares from another entity owned by defendants); Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 1231 n. 47 (Del. Ch. 2001), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002)(applying entire fairness standard under the second prong of Aronson where the director of one corporation also serves as a director for the other corporation in the challenged transaction); see also Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d at 1115 (holding a "controlling or dominating shareholder standing on both sides of a transaction, as in a parent-subsidiary context, bears the burden of proving its entire

fairness" in an interested, cash-out merger transaction by a controlling shareholder).[10]
In these cases, the controlling shareholders stood on both sides of the challenged
transactions by having an interest in both of the companies involved in the transaction.
See Orman, 794 A.2d at 20 (applying entire fairness to controlling party "who stands
on both sides of the transaction" in a squeeze out merger or a merger between two
corporations under the control of a controlling shareholder).[11]

In contrast, the challenged transaction here is neither a merger nor an exchange
of stock between two companies, but rather a self-tender offer by Bridgepoint to buy
its own stock from its shareholders. "In today's financial world, dividends and self-
tender offers are viewed as conventional methods of delivering to shareholders a return
on their investment. The transactional choices the Board made here–to assume debt
and conduct a cash self-tender offer–were classic business judgment decisions of the
kind that are normally protected by the business judgment rule." Weiss v. Samsonite
Corp., 741 A.2d 366, 371-72 (Del. 1999)(footnote omitted). Generally, "Delaware law
does not judge by the entire fairness standard voluntary, non-coercive offers by
corporations to acquire their own shares." Pfeffer, 2008 WL 308450, at *7 (citing
Frank v. Arnelle, 1998 WL 668649 at *4 (Del. Ch. Sept. 16, 1998) (recognizing that
"neither Delaware law nor federal law requires the issuer in a Dutch auction to offer
its stockholders the opportunity to tender at a fair price"). Unlike the controlling

---

[10] Similarly, Plaintiffs' notice of supplemental authority provides the transcript
from a case involving a controlling shareholder that has an interest in two different
entities engaged in the challenged transaction and the shareholder will receive a benefit
from the transaction that will not also be received by the minority shareholders. Pls.
Notice of Supp. Authority at 1(Dkt. No. 24)(citing Transcript of Oral Argument,
Montgomery v. Erickson Air-Crane, Inc., No. 8784-VCL (Del. Ch. Apr. 15, 2014 (Dkt.
No. 24-1)). As a result, it is equally distinguishable from the challenged tender offer
in this case.

[11] See also Sinclair Oil Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971)
("[Intrinsic fairness standard is] applied only when the fiduciary duty is accompanied
by self-dealing-the situation when a parent is on both sides of a transaction with its
subsidiary. Self-dealing occurs when the parent, by virtue of its domination of the
subsidiary, causes the subsidiary to act in such a way that the parent receives something
from the subsidiary to the exclusion of, and detriment to, the minority stockholders of
the subsidiary.").

shareholders in the cases relied upon by Plaintiffs, Warburg does not receive a benefit from the self-tender offer that is unavailable to the minority shareholders.  The tender offer price applies equally to all Bridgepoint stock.  Plaintiffs contend Warburg, as a private equity firm, must realize gains on its investments in order to return profits to its investors and to itself.  (Compl. ¶ 29).  Warburg's interest in realizing a profit on the sale of their stock is likely one shared by other shareholders, and realizing a profit is available to them on the same terms as it is to Warburg through the challenged tender offer.

Furthermore, the complaint alleges generally that Warburg "caused" Bridgepoint's Board to agree to the market-premium tender offer in order to generate cash to return to itself and its investors and that the Board "knowingly acquiesced" to "Warburg's proposing, negotiating, timing and initiating" the tender offer for its own benefit to the detriment of Bridgepoint. (Compl. ¶ 58, 68).  Notably absent from the complaint, however, are any factual allegations suggesting how Warburg played any role in the timing, crafting, or approval of the self-tender offer.[12]  As currently pled, Plaintiffs have not alleged that Warburg stood on both sides of the self-tender offer such that the entire fairness standard would apply.

As a result, the business judgment rule remains the proper standard under the second prong of Aronson.  Plaintiffs' claims challenge the pricing and timing of the tender offer, but these are classic business judgment decisions of the kind normally protected by the business judgment rule and reserved for the Board.  See Weiss, 741 A.2d at 371-72.  For the reasons set forth above, Plaintiffs have not alleged facts creating a reasonable doubt that the transaction was the product of a valid exercise of business judgment.  Accordingly, the court concludes Plaintiffs have not established demand futility under the second prong of Aronson.

/ / /

---

[12] As previously noted, the complaint alleges Defendants Hackett and Sarma were employees of Warburg, but this is insufficient to challenge the independence of a majority of the seven-member Board.

## CONCLUSION

In sum, Plaintiffs have not sufficiently alleged that Defendants either stood on both sides of the transaction or were interested in the transaction by virtue of receiving a special benefit unshared with the other shareholders. Nor have Plaintiffs alleged facts suggesting the presumptive protection of the business judgment rule should not apply. Thus, Plaintiffs have not established demand futility as required by Rule 23.1(b)(3) under either the first or second prong of <u>Aronson</u>. Additionally, Plaintiffs have failed to allege demand futility based upon their allegation that the Individual Defendants' faced a substantial likelihood of future liability regarding the tender offer.

Based on the foregoing, Defendants' motions to dismiss for failure to allege demand futility under Rule 23.1(b)(3) are GRANTED WITH LEAVE TO AMEND.

Should Plaintiffs wish to file a second amended complaint, they must do so within twenty days of this order.

IT IS SO ORDERED.

DATED: October 17, 2014

_____
Hon. Jeffrey T. Miller
United States District Judge

13-cv-2947 JM (JLB)